PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ERNEST E. OMOTOSHO, | ) | |
| | ) | CASE NO. 4:11CV00441 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| GIANT EAGLE, INC., | ) | |
| | ) | **MEMORANDUM OF OPINION &** |
| Defendant. | ) | **ORDER** [Resolving ECF No. 116] |

Plaintiff Ernest E. Omotosho presents the Court with a motion for a new trial.  ECF No. 116.
A trial of Plaintiff's claim that he was wrongfully discharged from employment because of his race,
African American, resulted in an unanimous verdict in favor of Defendant Giant Eagle, Inc.  No
African Americans sat on the jury that rendered the verdict.  No African Americans were on the
panel from which the jury was selected.  Plaintiff asserts that he was denied his right to a jury
selected from a fair cross section of the community, and, therefore, the jury selection process used
by the Northern District of Ohio failed to comply with the Jury Selection and Service Act of 1968
("JSSA"), 28 U.S.C. § 1861 *et seq.*

The Court has considered the briefs submitted by the parties, studied the evidence, and
reviewed the governing law. The evidence shows that African Americans are significantly
underrepresented in the pool of qualified candidates available for jury service in Youngstown, Ohio.
Although the Court believes that measures can and must be undertaken to improve this shortcoming

(4:11CV00441)

of the jury selection process, Plaintiff's motion for a new trial is denied because he did not make a *prima facie* showing that the fair cross section requirement of the JSSA was violated.

## I. **Factual and Procedural Background**

This case had its genesis in the decision of Defendant, a regional supermarket chain, to fire Plaintiff as a stock clerk because he allegedly consumed an unpaid food item in violation of Defendant's workplace policy.  ECF Nos. 48 at 1-2; 51 at 2-3.  Count One of the complaint alleged that white employees had committed similar or worse infractions but, unlike Plaintiff, were not terminated from employment, and that Plaintiff's discharge "violated [his] rights to be free from racial discrimination."  ECF No. 1-2 at 2.  Count Two alleged that Defendant breached contractually binding workplace policies espousing equal opportunities for all employees without regard to race.  ECF No. 1-2 at 2-3.  Count Three alleged that Defendant's actions constituted "libel and defamation of plaintiff's character."  ECF No. 1-2 at 3-4.  Count Four alleged that Defendant wilfully, recklessly, or negligently caused Plaintiff to suffer emotional distress.  ECF No. 1-2 at 4.

Defendant removed the action from the Mahoning County Court of Common Pleas on the basis of federal question jurisdiction.  ECF No. 1.  Noting that the complaint alleged a deprivation of rights secured by a collective bargaining agreement ("CBA"), that a CBA governed all the terms and conditions of Plaintiff's employment, and that Count Two essentially alleged a violation of a CBA, Defendant claimed that the lawsuit implicated federal law, namely, § 301 of the Labor Management Relations Act ("LMRA").[1]  ECF No. 15 at 4-6; *see* ECF No. 1-2 at 1-3.  Defendant also

---

[1] Section 301 of the LMRA provides: "Suits for violation of contracts between an
(continued...)

2

(4:11CV00441)

asserted that the LMRA applied because Plaintiff's prayer for relief seeks reinstatement, a CBA-created right. ECF No. 15 at 7. The Court agreed that it possessed federal jurisdiction, and denied a motion filed by Plaintiff to remand the case. ECF No. 17.

The parties forewent the filing of summary judgment motions and commenced a jury trial. Shortly prior to trial, the parties stipulated to the dismissal of Counts Two and Four, and the Court dismissed Count Three as untimely. ECF Nos. 58 and 78. The only matter to be tried was Count One: Plaintiff's claim of unlawful discharge on the basis of his race. After a three-day trial, an eight-member jury, all of whom were Caucasian, returned an unanimous verdict in favor of Defendant.

The issue of the jury's racial composition was first raised by Plaintiff at the start of *voir dire*. He remarked to the Court that none of the twenty-four individuals comprising the panel that appeared for jury service were African American. He then moved to "stop the *voir dire* proceedings and conduct a hearing on the process that led us to have a [panel] of all Caucasian[s] and no African-Americans." The Court–although observing that there appeared to be no African American panelists–denied Plaintiff's motion. Even so, the Court informed the parties that it would hold a hearing after the completion of *voir dire* and invite a representative from the Clerk's Office to answer questions regarding the jury selection procedures. At the conclusion of that hearing, which was held prior to opening statements, Plaintiff moved for a "mistrial." He contended that a fair jury

---

[1](...continued)
employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a).

(4:11CV00441)

had not been selected and that "the statistical likelihood of pooling a 24-member panel that includes no African-Americans in an evenhanded system would be virtually zero."  The Court again denied Plaintiff's motion.  Nevertheless, because the Clerk's Office representative conceded that she was not qualified to answer all of Plaintiff's questions, and because Plaintiff had not been given an adequate opportunity to examine the relevant data, the Court allowed Plaintiff to "take up the issue again" after he had a chance to investigate the jury selection procedures further.

Plaintiff did not offer additional evidence to support his jury challenge until after the trial. After the Court entered judgment in favor of Defendant, Plaintiff timely moved for a new trial pursuant to Rule 59.  Plaintiff claims he was denied his right under the JSSA to a jury selected from a fair cross section of the community.  ECF No. 116.  In support of his motion, Plaintiff filed a memorandum of law and a number of exhibits, including the sworn affidavit of Guant-Hwa Andy Chang, a professor of mathematics and statistics; data, reports, and responses provided by the Clerk of Court for the Northern District of Ohio; and U.S. Census data.  ECF Nos. 117; 117-1; 117-2; 123-1; 123-2; 123-3; 123-4.  Defendant filed a brief in opposition.  ECF No. 118.  Plaintiff filed a reply and supplemental memoranda, and Defendant filed a supplemental opposition.  ECF Nos. 119, 123, 127-1; 131.  The motion is ready to be resolved.

## II. Legal Standard

Fed. R. Civ. P. 59 (a)(1)(A) authorizes a court to grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  The Sixth Circuit has interpreted Rule 59 to require a new trial when the trial was "unfair to the moving party in some fashion . . . ."  *Advance Sign Group, LLC v. Optec Displays, Inc.*, 722 F.3d 778, 787

4

(4:11CV00441)

(6th Cir. 2013) (*quoting Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 405 (6th Cir. 2005)). A district court has "considerable discretion" in deciding whether to grant a Rule 59 motion. *Leisure Caviar, LLC v. U.S. Fish & Wildlife Service*, 616 F.3d 612, 615 (6th Cir. 2010).

### III. Discussion

The motion before the Court raises questions concerning whether Plaintiff received his statutory entitlements under the JSSA. The act declares that "[i]t is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. The "fair cross section" language is drawn from the Supreme Court's jurisprudence defining criminal defendants' rights to a fair jury under the Sixth Amendment. *In re United States*, 426 F.3d 1, 8 (1st Cir. 2005). Although the Sixth Amendment does not govern civil cases; *Turner v. Rogers*, ___ U.S. ___, 131 S. Ct. 2507, 2516, 180 L. Ed. 2d 452 (2011); the Sixth Circuit and its sister courts have adopted the test for evaluating constitutional fair cross section claims as the standard for analyzing fair cross section claims under the JSSA, which applies to civil cases. *United States v. Allen*, 160 F.3d 1096, 1102 (6th Cir. 1998), *cert. denied*, 526 U.S. 1044, 119 S. Ct. 1345, 143 L. Ed. 2d 508 (1999); *see United States v. Royal*, 174 F.3d 1, 6 (1st Cir. 1999); *United States v. Shinault*, 147 F.3d 1266, 1270-71 (10th Cir.), *cert. denied*, 525 U.S. 988, 119 S. Ct. 459, 142 L. Ed. 2d 411 (1998); *United States v. Clifford*, 640 F.2d 150, 155-56 (8th Cir. 1981). To establish a *prima facie* violation of the fair cross section requirement, a litigant must demonstrate:

(4:11CV00441)

> (1) that the group alleged to be excluded is a 'distinctive' group in the community;
> (2) that the representation of this group in venires from which juries are selected is
> not fair and reasonable in relation to the number of such persons in the community;
> and (3) that this underrepresentation is due to systematic exclusion of the group in the
> jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979).

There is no dispute that African Americans are a "distinctive" group in the community. The salient questions raised by Plaintiff's motion are whether the remaining *Duren* requirements are met. Plaintiff asserts that the evidence he marshals conclusively shows that, here in Youngstown, the representation of African Americans in jury panels (interchangeably used with "venires") is not fair and reasonable in relation to the African American presence in the community, and African Americans are systematically excluded from the jury selection process. The Court examines the evidence in the sections below.

### A.  JSSA's Statutory Requirements

Before proceeding to the substance of Plaintiff's claims, the Court must address the contention that Plaintiff's motion fails to comply with threshold statutory requirements. Defendant claims that the JSSA does not permit Plaintiff to seek a new trial. ECF No. 118 at 6. The exclusive method by which Plaintiff could have challenged the jury, argues Defendant, was to move to stay the proceedings. ECF No. 118 at 6. Defendant also claims that Plaintiff was required to make that motion before *voir dire* began, and he failed to do so. ECF No. 118 at 6.

The JSSA provides: "In civil cases, before the voir dire examination begins, or within seven days after the party discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, any party may move to stay the proceedings on the ground of

6

(4:11CV00441)

substantial failure to comply with the provisions of this title in selecting the petit jury." 28 U.S.C. § 1867(c). The next subsection in § 1867, subsection (d), states that upon a properly filed motion the moving party "shall be entitled" to present in support of such motion "the testimony of the jury commission or clerk," "any relevant records and papers" used by the jury commission or clerk, and "any other relevant evidence." 28 U.S.C. § 1867(d). If the court determines that there has been "a substantial failure to comply with the provisions of this title" in selecting a petit jury, then the statute directs the court to "stay the proceedings pending the selection of a petit jury in conformity with this title." *Id.* Importantly, subsection (e) specifies that "[t]he procedures prescribed by this section shall be the exclusive means by which . . . a party in a civil case may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title." 28 U.S.C. § 1867(e).

Defendant contends that the exclusivity requirement of § 1867(e) defeats Plaintiff's attempt to obtain a new trial. Its reasoning: a motion to stay is the only instrument described in § 1867 as a vehicle to "challenge any jury." The Court is not persuaded that "exclusive" means that a litigant is foreclosed from recourse once the district court *denies* the motion to stay. That could not be what Congress intended. Plaintiff moved–twice–to stop the proceedings. The first motion was made at the commencement of *voir dire*, when Plaintiff's counsel pointed out that there were no African Americans in the panel. The second motion was presented at the hearing conducted after *voir dire*.[2] Because the Court denied Plaintiff the relief he sought, he should be entitled to seek a new trial if he believes he was unfairly prejudiced by the Court's decisions. In so seeking, moreover, Plaintiff

---

[2] Although Plaintiff characterized his second motion as a motion for a "mistrial," it was evident that what he sought was a halt to the proceedings.

7

(4:11CV00441)

is not attempting to "challenge any jury" within the meaning of § 1867(e).  He accomplished that feat when he timely lodged the motions to stay.  Rather, what Plaintiff challenges now are the Court's rulings with respect to those motions.  Thus, the exclusivity requirement of § 1867(e) does not apply.

Defendant also maintains that Plaintiff's efforts to stop the proceedings were untimely because they were not made prior to the beginning of *voir dire*.  A party is permitted under the JSSA to present a motion to stay "before the voir dire *examination* begins, or within seven days after the party discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier . . . ."  28 U.S.C. § 1867(c) (emphasis added).  Plaintiff's first motion to stay was lodged after the Court swore in the jury panel but before the Court and the parties began questioning the prospective jurors.  Thus, the motion was made prior to the "examination" of the jury panel.  Moreover, Plaintiff could not have discovered the grounds for his motion earlier than the day of *voir dire*, when he was able to observe, for the first time, the racial composition of the jury panel.  Therefore, the Court concludes that Plaintiff complied with the time requirements of § 1867(c).[3]

Contrary to Defendant's arguments, Plaintiff's motion for a new trial is not barred by the above statutory requirements.  Accordingly, the Court proceeds to the merits of the motion.

---

[3] Section 1867(d) contemplates that a § 1867(c) motion is to be accompanied by "a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title . . . ."  Plaintiff's first motion to stay was not accompanied by an affidavit pursuant to § 1867(d), and the affidavit was not submitted until it was filed in support of Plaintiff's motion for a new trial.  The Court gave Plaintiff, however, several extensions of time to develop the facts for the affidavit.  When the Court denied Plaintiff's first motion to stay, it also scheduled a hearing to permit Plaintiff to examine a Clerk's Office representative.  At the end of the hearing, the Court permitted Plaintiff to "take up the issue again" after having had an adequate opportunity to investigate the jury selection procedures.  The Court granted Plaintiff an additional extension of time to file the affidavit after the completion of trial.  *See* ECF No. 106.

(4:11CV00441)

### B. Fair and Reasonable Representation

Plaintiff argues that the representation of African Americans on Youngstown jury panels is not fair and reasonable in relation to the representation of African Americans in the community. ECF No. 117 at 3.  As evidence, Plaintiff points out that no African Americans appeared on the panel from which jurors were selected for his trial.  ECF No. 117 at 2.  Plaintiff also submits a report prepared by the Clerk of Court, known as an "AO 12,"[4] which analyzes the operation of the jury selection plan in Youngstown.  ECF No. 117 at 3.  One function of the AO 12 is to compare the demographic characteristics of a particular qualified jury wheel against the demographic characteristics of the corresponding community.  The proffered report reveals that as of March 14, 2012, African Americans comprised only 3.46% of the 2,458 names in the qualified jury wheel for Youngstown, even though African Americans are 9.5% of the voting-age population in the Youngstown community.[5]  ECF No. 117-2 at 10.

The disparity must be understood in the context of the Northern District of Ohio's jury selection procedures.  The district consists of four geographic divisions: Akron, Cleveland, Toledo, and Youngstown (the division where the instant Court sits).   In the Northern District of Ohio, as in other federal judicial districts, the jury selection process is governed by a "written plan" adopted by

---

[4] The AO 12 report is mandated by 28 U.S.C. § 1863(a).  Section 1863(a) provides, in relevant part, that "[e]ach district court shall submit a report on the jury selection process within its jurisdiction to the Administrative Office of the United States Courts in such form and at such times as the Judicial Conference of the United States may specify."

[5] The 9.5% figure, representing the percentage of Youngstown residents 18 years of age or older who are African American, is derived from the 2010 U.S. Census.  ECF No. 117-2 at 11.

9

(4:11CV00441)

the district court in accordance with the JSSA.  28 U.S.C. § 1863(a).  The jury selection plan must

comply with the JSSA's provisions and must also be approved by a reviewing panel consisting of

the members of the Judicial Council of the Sixth Circuit.  *Id.*

The district's current plan prescribes that the source of names from which potential jurors

are selected shall be from the general election voter registration lists provided by the Ohio Secretary

of State.  ECF No. 117-2 at 32.  Following each presidential election, names are randomly drawn

from these lists and placed in a master jury wheel designated for a geographic division.  ECF No.

117-2 at 33.  The master jury wheel contains names of individuals residing within the division to

whom juror qualification questionnaires are mailed.  ECF No. 117-2 at 34.  The Clerk determines,

based on the information returned, whether an individual is unqualified, exempt, or excused from

jury service.  ECF No. 117-2 at 34-35.  The names of those whom are deemed to be qualified for

service are then placed in a qualified jury wheel.  ECF No. 117-2 at 34.  The qualified wheel holds

the names of individuals whom, from time to time, are randomly selected by the Clerk to be issued

summonses for jury service.  ECF No. 117-2 at 36.  In June 2013, the month of Plaintiff's trial, the

Youngstown division was relying on the master wheel created after the 2008 presidential election.

ECF No. 117-2 at 3.

The AO 12 for Youngstown discloses an underrepresentation of African Americans in the

source of names from which qualified individuals are chosen for jury service.  Although the AO 12

does not provide precise information regarding the demographic composition of venires, or jury

panels, the report serves as a reliable proxy because veniremen are randomly selected from the

qualified jury wheel.  The disproportionate representation of groups within a qualified wheel,

10

(4:11CV00441)

therefore, may provide a basis for a fair cross section claim.  *See United States v. Jackson*, 46 F.3d 1240, 1244 (2d Cir. 1995) ("fair cross-section requirement applies only to the larger pool serving as the source of names . . . . In other words, the Sixth Amendment guarantees the *opportunity* for a representative jury venire" [citation omitted; emphasis in original]).  The mere underrepresentation of a distinctive group does not, alone, adversely implicate the fair cross section requirement. Plaintiff must, pursuant to *Duren*, show that the underrpresentation is "not fair and reasonable."  In that regard, Plaintiff urges the Court to view the evidence through two lenses: absolute disparity and comparative disparity.  ECF No. 117 at 3.  These statistical concepts are ably summarized by the Tenth Circuit as follows:

> Absolute disparity measures the difference between the percentage of a group in the general population and its percentage in the qualified wheel.  For instances, if Asians constitute 10% of the general population and 5% of the qualified wheel, the absolute disparity is 5%.  Comparative disparity measures the *decreased likelihood* that members of an underrepresented group will be called for jury service, in contrast to what their presence in the community suggests it should be.  This figure is determined by dividing the absolute disparity of the group by that group's percentage in the general population.  In the example above, the comparative disparity is 50%: Asians are half as likely to be on venires as they would be if represented in proportion to their numbers in the community.

*Shinault*, 147 F.3d at 1272 (emphasis in original).  According to the AO 12, the underrpresentation of African Americans in the Youngstown qualified jury wheel is 6.04%, as measured by the absolute disparity method, and 63.7%, as measured by the comparative disparity method.

    The Court acknowledges that many "[c]ourts are generally reluctant to find that the second element of a prima face [fair cross section] case has been satisfied when the absolute disparities are less than 10%."  *Shinault*, 147 F.3d at 1273; *see United States v. Rodriguez*, 776 F.2d 1509, 1511

11

(4:11CV00441)

(11th Cir. 1985) ("this circuit has consistently found that a prima facie case of underrepresentation has not been made where the absolute disparity between these percentages does not exceed ten percent"); *United States v. Quinones*, No. 93-10751, 1995 WL 29500 at *9 (9th Cir January 26, 1995) ("[t]his circuit has consistently held that absolute disparities below 7.7% are insubstantial and constitutionally permissible"); *United States v. Butler*, 611 F.2d 1066, 1070 (5th Cir) (10% absolute disparity permissible), *cert. denied*, 449 U.S. 830, 101 S. Ct. 97, 66 L. Ed. 2d 35 (1980); *United States v. Rioux*, 930 F. Supp. 1558, 1570 (D.Conn. 1995) ("courts have approved disparities between 2% and 11.5%"), *aff'd*, 97 F.3d 648 (2d Cir. 1996).

Nevertheless, the Sixth Circuit has doubted "the wisdom of applying the absolute disparity test to measure the underrepresentation of [a] small African American population . . . ." *Smith v. Berghuis*, 543 F.3d 326, 337 (6th Cir. 2008), *rev'd in part on other grounds*, 559 U.S. 314, 130 S. Ct. 1382, 176 L. Ed. 2d 249 (2010). For example, if a district with a 10% non-white population has 0.5% non-whites in the qualified wheel, then the 9.5% absolute disparity "may not invoke disapproval under an absolute measure but may require it under a comparative measure." *Id.* at 338 (*quoting Foster v. Sparks*, 506 F.2d 805, 835 (5th Cir. 1975)). The Sixth Circuit therefore declared that "[w]here the distinctive group alleged to have been underrepresented is small . . . the comparative disparity test is the more appropriate measure of underrepresentation." *Id.*

Using the comparative disparity analysis, the Sixth Circuit concluded, in *Berghuis*, that the numbers established in that case were "sufficient to demonstrate that the representation of African American veniremen in Kent County at the time of Petitioner's trial was unfair and unreasonable." *Berghuis*, 543 F.3d at 338. The evidence showed that 7.28% of the jury-eligible population of Kent

12

(4:11CV00441)

County was African American, and, in the six months prior to the petitioner's trial, only 6% of those who appeared for jury panels in that county were African American. *Id.* at 337-38. The comparative disparity was therefore 18% in the six months prior to the trial.  *Id.*  The evidence also showed that this disparity increased to 34% in the month of the trial.  *Id.*  These numbers–18% and 34%–are considerably lower than the 63.7% comparative disparity demonstrated by Plaintiff.

Admittedly, the Sixth Circuit's discussion and application of the comparative disparity method is dicta.  *Berghuis* was brought to federal court not as a direct jury challenge but as a *habeas* petition challenging the Michigan Supreme Court's rejection of the petitioner's fair cross section claim.  *Berghuis*, 543 F.3d at 333.  The Michigan Supreme Court had given the petitioner "the benefit of the doubt" on the second *Duren* requirement, and had proceeded to the third prong of the analysis where it reached the conclusion that was ultimately dispositive, namely, that the petitioner had failed to prove the systematic exclusion of African Americans from the jury selection process. *People v. Smith*, 463 Mich. 199, 205, 615 N.W.2d 1 (2000).  It must also be noted that the comparative disparity analysis can be misleading when members of a group compose only a small percentage of those eligible for jury service.  *Berghuis v. Smith*, 559 U.S. 314, 329, 130 S. Ct. 1382, 176 L. Ed. 2d 249 (2010).  To illustrate: if the community contained only one member of a particular group, and that member was not included in the jury wheel, the comparative disparity would be 100% even though a jury without that member would "clearly" form a fair cross section of the community. *United States v. Royal*, 174 F.3d 1, 7 n.4 (1st Cir. 1999); *see also United States v. Hafen*, 726 F.2d 21, 24 (1st Cir.) ("the smaller the group is, the more the comparative disparity figure distorts the proportional representation"), *cert. denied*, 466 U.S. 962, 104 S. Ct. 2179, 80 L.

13

(4:11CV00441)

Ed. 2d 561 (1984); *but see United States v. Rogers*, 73 F.3d 774, 777 (8th Cir.) ("the comparative

disparity calculation provides a more meaningful measure of systematic impact *vis-a-vis* the

'distinctive' group"), *cert. denied*, 517 U.S. 1239, 116 S. Ct. 1889, 135 L. Ed. 2d (1996).

"[T]he debate about use of absolute disparity versus comparative disparity has existed for

at least 25 years." *Royal*, 174 F.3d at 6 n.3. The Court need not, however, delve further into this

subject in order to conclude that the numbers shown by Plaintiff are dismal. African Americans

constitute a substantial segment of the Youngstown population–nearly 10%–yet they comprised

only one-third of that figure in the qualified wheel, as reported by the AO 12. Plaintiff's expert in

statistics, Guant-Hwa Andy Chang, opines that this difference causes African Americans to be

underrepresented on jury panels 95.12% of the time. ECF No. 117-1 at ¶ 11. Excusing this shortfall

through application of the 10% absolute disparity marker cannot be countenanced. "[T]o hold

otherwise would prevent fair cross-section claims in areas where the minority population was less

than 10%." *Ambrose v. Booker*, 684 F.3d 638, 643 (6th Cir. 2012), *cert. denied*, __ U.S. __, 133 S.

Ct. 993, 184 L. Ed. 2d 771 (2013).

The population of African Americans in Youngstown is not so slight as to disfavor the

comparative disparity analysis, which shows that African Americans were 63.7% less likely to be

called for jury service than they would have been if they were proportionally represented in the

qualified wheel. This likelihood is significant, and its effects can be pernicious. No expert is needed

for the Court to perceive that this degree of African American underrepresentation in the jury

selection process can diminish the quality of jury deliberations, frustrate the ability of juries to reach

decisions reflecting "the community's sense of justice," and threaten the public's confidence in the

(4:11CV00441)

fairness and impartiality of our judicial system.  *See Batson v. Kentucky*, 476 U.S. 79, 87, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); *Taylor v. Louisiana*, 419 U.S. 522, 529 n.7, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975); *Apodaca v. Oregon*, 406 U.S. 404, 410-411, 92 S. Ct. 1628, 32 L. Ed. 2d 184 (1972) (plurality opinion); *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 227, 66 S. Ct. 984, 90 L. Ed. 1181 (1946) (Frankfurter, J., dissenting).

The Clerk of Court has assured that, as of December 6, 2013, the qualified wheel for Youngstown has markedly improved since it was analyzed in the 2012 AO 12; the proportion of African Americans has increased to 5.41%.  ECF No. 127-2 at 2, 11. While this percentage is healthier, it does not excuse or redeem the wheel's deficiencies at the time of the report.  It is also not a percentage that should be institutionally regarded as acceptable when it remains, in fact, highly unsatisfactory.  Efforts must be made to understand why the qualified wheel so materially underrepresents African Americans in Youngstown.  The evaluation and adoption of methods to improve–and maintain over time–the representative characteristic of the qualified wheel is imperative to the fair administration of justice, and must be made a top priority in this district.

Notwithstanding the above, the Court will refrain from ruling on whether Plaintiff's evidence satisfies the second prong of the *Duren* test.  Such a ruling need not be made because, as will be explained below, Plaintiff fails to satisfy the third prong of the test, which requires that he demonstrate that African Americans are systematically excluded from the jury selection process.

### C. Systematic Exclusion

Plaintiff claims that two factors work in tandem to systematically exclude African Americans from the jury selection process. ECF No. 117 at 4-6.  First, Plaintiff contends that "it

(4:11CV00441)

is well known that African-Americans have a comparatively high rate of mobility." ECF No. 117 at 5.  Second, Plaintiff argues that the Northern District of Ohio fails to update the addresses of the individuals whose names are in the master jury wheel.  ECF No. 117 at 4-6.  According to Plaintiff's theory, African Americans are therefore less likely to receive and return the juror qualification questionnaires mailed by the Clerk's Office, which, in turn, causes them to be underrepresented in the qualified jury wheel.  ECF No. 119 at 7.

1.

Before turning to the evidence, the Court first considers whether Plaintiff's theory describing systematic exclusion can prevail as a matter of law.  Systematic exclusion means that "the cause of the underrpresentation . . . [was] inherent in the particular jury-selection process utilized." *Duren*, 439 U.S. at 366; *see Polk v. Hunt*, No. 95-5323, 1996 WL 47110 at *2 (6th Cir. February, 5, 1995); *United States v. Smallwood*, 188 F.3d 905, 914 (7th Cir. 1999).

The classic examples of systematic exclusion are found in the cases of *Taylor* and *Duren*. *Taylor* involved a Louisiana law requiring that a woman could not be selected for jury service unless she had previously filed a written declaration of her desire to serve. *Taylor v. Louisiana*, 419 U.S. 522, 523, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975).  The Supreme Court held that the law, which did not apply to men, and which caused women to account for no more than 10% of the jury wheel, systematically excluded women from jury service.  *Id.* at 524 and 538.  In *Duren*, both the questionnaires and the summonses mailed to prospective jurors specially allowed women to claim automatic exemptions from jury service.  439 U.S. at 361.  As a result of these exemptions, only 26.7% of those summoned for jury service were women, and only 14.5% of those who appeared in

16

(4:11CV00441)

venires during the period in which the defendant's jury was chosen were female.  *Id.*  at 367.  The Supreme Court held that the resulting disproportionate exclusion of women  "was quite obviously due to the *system* by which juries are selected," which system was "the operation of Missouri's exemption criteria . . . as implemented in Jackson County."  *Id.* (emphasis in original).

After *Duren* and *Taylor*, circuit courts, including the Sixth Circuit, have stated that a group is not systematically excluded if prospective jurors are "gathered without *active* discrimination." *Polk*, 1996 WL 47110 at * 2 (emphasis added); *see Barber v. Ponte*, 772 F.2d 982, 997 (1st Cir. 1985) ("courts have tended to allow a fair degree of leeway in designating jurors so long as the state or community does not *actively* prevent people from serving or actively discriminate" [emphasis in original]), *cert. denied*, 475 U.S. 1050, 106 S. Ct. 1272, 89 L. Ed. 2d 580 (1986); *United States v. Cecil*, 836 F.2d 1431, 1446 (4th Cir.) (*quoting Ponte*), *cert. denied*, 487 U.S. 1205, 108 S. Ct. 2846, 101 L. Ed. 2d 883 (1988).  Active discrimination need not involve the intent to discriminate. *Jackman*, 46 F.3d at 1246 ("the defendant need not prove discriminatory intent on the part of those constructing or administering the jury selection process").  In *Jackman*, a jury clerk, when selecting individuals to summon for jury service, substantially relied on a qualified jury wheel that had erroneously excluded all residents from two cities within the division.  *Id.* at 1245.  The two cities were home to 62.93% and 68.09% of all voting-age African American and Hispanic populations within the division.  *Id.* at 1242.  In holding that these groups were systematically excluded from jury selection, the Second Circuit noted that the clerk's level of fault was irrelevant.  *Id.* at 1245. Rather, "[s]ince the inadequacy of the procedure used was plainly accomplished by *action within the Court*, what occurred present[ed] a cognizable [fair cross section] claim."  *Id.* (emphasis added).

17

(4:11CV00441)

The Court is not aware of any case that has found that a group was systematically excluded because insufficient effort was made to mitigate the effects of the group's relatively higher geographic mobility.  Plaintiff states that, to his knowledge, "no court has previously considered the issue." ECF No. 119 at 8 n.3.  In fact, some courts have declared that the influence of social and economic factors on juror participation cannot demonstrate the systematic exclusion of a distinctive group. *See, e.g.*, *People v. Smith*, 463 Mich. 199, 206, 615 N.W.2d 1 (2000) ("Sixth Amendment does not require [the government] to counteract these factors").  These courts take the view that "under the systematic exclusion requirement the assessment of jury representativeness should take into account only 'affirmative government action' and not 'private sector influences.'" *United States v. Purdy*, 946 F. Supp. 1094, 1103 (D.Conn. 1996) (*quoting Rioux*, 930 F. Supp. at 1572-73).

The Sixth Circuit has not foreclosed the consideration of social and economic factors in the systematic exclusion analysis.  Rather, it has observed: "[T]he Sixth Amendment is concerned with social or economic factors when the particular *system* of selecting jurors makes such factors relevant to who is placed on the qualifying list and who is ultimately called to or excused from service on a venire panel." *Berghuis*, 543 F.3d at 341. The system at issue in *Berghuis* involved, among other things, a county's practice of allowing prospective jurors to "essentially 'opt out' of jury service" if jury duty would constitute a hardship based on child care concerns, transportation issues, or the inability to take time from work. *Id.* at 340.  The panel concluded that African Americans were systematically excluded from jury selection because the evidence showed that the county's

18

(4:11CV00441)

automatic granting of these excuses disproportionately impacted African American prospective jurors, and effectively removed the randomness from the jury selection process.[6]  *Id.* at 340.

The force causing the underrepresentation in *Berghuis* is, however, materially distinguishable from the influence claimed here.  The exclusionary force in that case was the county's active elimination of African Americans from jury service, which, although unintentional, was claimed to have caused the underrepresentation at issue.  In other words, the culprit was the system of "opt-out" procedures as implemented by the county.  To the contrary, Plaintiff does not, in the present case, claim that African Americans in Youngstown are being actively eliminated from jury service.  Rather, he complains about the system's *inaction*, or lack of effort, in offsetting the private sector influence of geographic mobility.  This claim does not fall within the penumbra of

---

[6] The Supreme Court's subsequent reversal of the Sixth Circuit's decision, noted previously, must be explained.  Because *Berghuis* was brought to federal court as a *habeas corpus* petition, the Sixth Circuit was constrained to apply the deferential standards set forth under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), to determine whether the Michigan Supreme Court unreasonably applied clearly established federal law as determined by the United States Supreme Court.  28 U.S.C. § 2254(d)(1).  The Michigan Supreme Court held that the influence of social and economic factors on juror participation does not demonstrate a systematic exclusion of African Americans, and rejected the petitioner's fair cross section claim.  *Smith*, 463 Mich. at 206.  The Sixth Circuit disagreed and held that the Michigan Supreme Court unreasonably applied clearly established federal law.  *Berghuis*, 543 F.3d at 342.  The United States Supreme Court reversed; it concluded that the Sixth Circuit had committed several errors, one being its determination that the matter was clearly settled under Supreme Court precedent.  *Berghuis*, 559 U.S. at 333 n.6.  Although the Supreme Court held that the law was not clearly established, it left open the question of "whether the impact of social and economic factors can support a fair-cross-section claim."  *Id.*  Because the Sixth Circuit's affirmative answer to the question was not reversed, it cannot be overlooked.  *See Bates v. United States*, 473 Fed. Appx. 446, 451 (6th Cir. 2012) ("we found a systematic exclusion when a jury selection process provided 'opt out' procedures resulting in the consistent underrepresentation of African-Americans").

(4:11CV00441)

conduct that has been understood by courts to constitute the systematic exclusion of a distinctive group. *See Bates v. United States*, 473 Fed. Appx. 446, 451 (6th Cir. 2012) (underrepresentation resulting from "individual choice" not attributable to jury selection system); *Sparks*, at 817 ("courts have uniformly maintained that [personal] predilections cannot . . . evoke judicial sanctions against the selection system"); *United States v. Barlow*, 732 F. Supp.2d 1, 40 (E.D.N.Y. 2010) ("systematic exclusion occurs where the underrepresentation is due to the system of jury selection itself, rather than external forces" [quotations omitted]), *aff'd* 479 Fed. Appx. 372 (2d Cir.), *cert. denied*, __ U.S. __, 133 S. Ct. 672, 184 L. Ed. 2d 477 (2012); *Rioux*, 930 F. Supp. at 1578 (failure to counteract "such private sector influences as voting patterns, demographic trends, and cultural differences" not systematic exclusion); *United States v. Kilpatrick*, No. 10CR20403, 2012 WL 3133939 at *7 (E.D. Mich. August 1, 2012) ("[d]iscrepancies resulting from the private choices of potential jurors do not represent the kind of constitutional infirmity contemplated by *Duren*" [quotations omitted]).

At its core, Plaintiff's theory describing the systematic exclusion of African Americans impugns the way voter registration lists are used in this district.  Because, according to Plaintiff, African Americans are more likely to change residences, the addresses culled from the voter lists will more likely become inaccurate with respect to African Americans over time.  ECF No. 119 at 5, 11.  Plaintiff thus maintains that "the use of only voter registration lists that did not produce a jury pool made up of a fair cross section of the community violated the JSSA."  ECF No. 117 at 2.

Yet, "[v]oter registration lists are the presumptive statutory source for potential jurors." *United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008).  The juror selection plan for this district, which prescribes the use of the voter registration lists, was approved by the Chief Judge and

(4:11CV00441)

by a reviewing panel consisting of the members of the Judicial Council of the Sixth Circuit.  ECF No. 117-2 at 38.  "The use of voter registration lists has been consistently upheld against both statutory and constitutional challenge, unless the voter list in question had been compiled in a discriminatory manner." *Cecil*, 836 F.2d at 1446; *see United States v. Test*, 550 F.2d 577, 587 n.10 (10th Cir. 1976) ("in adopting the voter registration lists as the 'preferred source' of names for prospective jurors, Congress not only intended to provide a relatively large and easily accessible source of names, but one to which all potential jurors would have equal access and which disqualified jurors solely on the basis of objective criteria"); *Sparks*, 506 F.2d 816-17 ("[w]e are aware of no case in which exclusive reliance on voter registration lists has been invalidated").  Furthermore, the circuits are in "complete agreement" that even if a particular group registers to vote in a proportion lower than the rest of the population, "neither the [JSSA] nor the Constitution require that a supplemental source of names be added to voter lists . . . ." *Odeneal*, at 412 (internal quotations omitted); *see Test* at 587 n.8.  This fact is instructive, for it underscores the principle that individual decisions whether to vote, like individual decisions whether to move, are products of private choices the ramifications of which are tolerated within the sanctioned, objective system.  Therefore, a system that relies exclusively on voter lists without resorting to measures that offset private-choice forces is not a system that actively or intentionally discriminates against any group.

Finally, other circuits have considered and rejected the theory offered by Plaintiff.  *See United States v. Orange*, 447 F.3d 792, 800 (10th Cir. 2006) (no systematic exclusion where "the clerk's office made no effort to update addresses before mailing questionnaires, or any effort to locate those whose questionnaires were returned as undeliverable, *thereby decreasing*

21

(4:11CV00441)

*representation in the more mobile minority population*" [emphasis added]); *United States v. Rioux, 97 F.3d 648, 658 (2d Cir. 1996)* ("inability to serve juror questionnaires because they were returned as undeliverable is *not due to the system itself, but to outside forces, such as demographic changes*" [emphasis added]); *see also Alba v. Quarterman*, 621 F. Supp.2d 396, 414 (E.D. Tex. 2008) (even assuming truth of claim that Hispanics "move more frequently than other groups," the "failure to update voter lists more rapidly than what is statutorily required does not constitute systematic exclusion"). Because the Sixth Circuit has yet to consider the issue, the Court follows the course charted by the Second and Tenth Circuits and holds that a group is not systematically excluded from the jury selection process when the system of selecting jurors does not proactively counteract the effects of the group's comparably higher rate of mobility.[7] This is *not* to say that proactive measures should not be taken. Emphatically, they should (see Part III B.). The impetus to do so, however, must arise from an institutional commitment to improve our system of justice for all who come before it, and not from the baseline obligations imposed by the fair cross section requirement.

2.

Even assuming, *arguendo*, that Plaintiff's theory successfully implicates the third *Duren* requirement, the evidence does not show that African American underrepresentation in the qualified jury wheel is caused by their comparably higher rate of geographic mobility.

---

[7] The Court notes that, notwithstanding this legal principle, the Northern District of Ohio *has* implemented a countervailing measure known as "juror stratification." This program, which Plaintiff contends is ineffective, will be discussed in the next section when the Court examines Plaintiff's evidence.

22

(4:11CV00441)

Plaintiff proffers the following statistics describing the mobility rates of African Americans and Caucasians in the three counties comprising the Youngstown division:

|  | African American | Caucasian | Overall |
|---|---|---|---|
| Columbiana County | 7.7% | 8.7% | 8.7% |
| Mahoning County | 12.1% | 6% | 7.2% |
| Trumbull County | 9.7% | 6.9% | 7.3% |

This data was compiled by the United States Census Bureau and is based on estimates of demographic trends in Columbiana, Mahoning, and Trumbull Counties from 2007 to 2011. ECF Nos. 117-1 at 13-30. The numbers represent the percentages of African Americans, Caucasians, and the overall population that moved within the same county during the period described. The numbers are, of course, highly imperfect measurements of overall mobility because they do not account for individuals who *moved away* from the county within the relevant time frame.

Based on these numbers, Plaintiff declares that "[t]here can be no doubt that the variance in rates of mobility between African-Americans and [Caucasians] when combined with a failure to maintain accurate and up[-]to[-]date lists of prospective jurors is a significant cause of the underrepresentation of African-Americans in the jury pool." ECF No. 119 at 8. In reality, the statistics tell a far murkier story. Assuming that the numbers are an accurate measure of geographic mobility, which they are not, African Americans are more mobile than Caucasians in only two out of the three counties. Moreover, there is no way to discern the degree in which geographic mobility affects African American representation in the qualified wheel. Many factors apart from geographic

23

(4:11CV00441)

mobility may cause disproportionate representation within the wheel.  The numbers presented by Plaintiff, while possibly intuitively appealing, actually provide little explanatory power.  No authority permits Plaintiff to "make out a prima face case merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation." *Berghuis*, 559 U.S. at 332 (emphasis in original).

The affidavit of Plaintiff's expert in statistics contributes little value.  Chang opines that the underrepresentation of African Americans was due "at least in part" to the failure to deliver juror questionnaires to a more mobile population.  ECF No. 119 at 7.  The expert's inability to ascribe with any certainty the explanatory weight of this causal influence comports with the Court's observation that the statistical evidence is insufficient.[8]

Plaintiff expends considerable energy assailing this district's "juror stratification" program.  According to the Clerk, in February  2010, the Clerk's Office began implementing a procedure known as "juror stratification" in order to counteract the underrepresentation of populations residing

---

[8] Other statistical evidence cited by Plaintiff is unavailing.  The AO 12 discloses that 51% of the juror qualification questionnaires mailed to names in the master jury wheel were returned as "undeliverable."  ECF No. 117-2 at 9.  Plaintiff claims that this high percentage supports his theory that juror questionnaires are less likely to be successfully delivered to the more mobile African American population.  ECF No. 119 at 3, 8.  According to the Clerk of Court, the 51% figure reported in the AO 12 is erroneous; the actual rate is 13%.  ECF No. 127-2 at 2.  Even if the Court were to assume that the correct rate is 51%, the number still does not explain how much of the underrepresentation at issue was due to the failure to deliver juror questionnaires to the African American population in Youngstown.

Plaintiff also submits data from other divisions within the Northern District of Ohio that describe geographic mobility, African American underrepresentation in the qualified wheel, and the delivery rates of juror questionnaires. *See* ECF No. 123.  Because this evidence suffers from the same inadequacies as the Youngstown data, it does not improve Plaintiff's argument.

(4:11CV00441)

in geographic areas that experience a higher rate of undeliverable juror qualification questionnaires. ECF No. 122-1 at 1.  In cases where a questionnaire is returned to the Court as "undeliverable," juror stratification requires that another questionnaire be mailed to another individual randomly selected from the same zip code from the master jury wheel.  ECF No. 117-2 at 1.  Plaintiff claims that this program was unauthorized, and is ineffective.  ECF Nos. 123  and 127-1.

No study has been undertaken to determine whether juror stratification achieves the results desired.  ECF No. 122-1 at 2.  Because the program was implemented nearly four years ago, and African American representation in the qualified wheel remains poor, there is reason to doubt the program's effectiveness.  A study and investigation of jury stratification may well be warranted. Nevertheless, because Plaintiff's evidence is insufficient to show the systematic exclusion of African Americans in the jury selection process, an inquiry as to the truth of Plaintiff's criticisms regarding juror stratification would be an unnecessary detour, which the Court declines to take.

## IV. <u>Conclusion</u>

Because Plaintiff has failed to show that African Americans in Youngstown, Ohio, are systematically excluded from the jury selection process, the Court denies Plaintiff's motion for a new trial.  Although the motion is denied, the Court cannot ignore the startling evidence showing that African Americans have been, and are likely to continue to be, seriously underrepresented in the pool of qualified candidates available for jury service in Youngstown.  This underrepresentation hobbles the judicial system by diminishing the quality of jury deliberations, obstructing the capacity of juries to reach decisions reflecting the community's sense of justice, and threatening public confidence in the fairness and impartiality of the courts.  The Court will not pretend that a solution

25

(4:11CV00441)

is readily or easily available.  To preserve the promise of the fair and equal administration of justice,

a greater commitment must be made to study, understand, and combat this insidious problem.


       IT IS SO ORDERED.


  January 31, 2014                          /s/ Benita Y. Pearson         
Date                                        Benita Y. Pearson
                                        United States District Judge